E-FILED
Monday, 12 January, 2009  09:21:29 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| GINA PURVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-1348 |
| | ) | |
| THE BOARD OF EDUCATION OF HALL HIGH | ) | |
| SCHOOL DISTRICT 502, DANIEL OEST, | ) | |
| PATRICIA LUNN, GARY VICINI, THE CITY | ) | |
| OF SPRING VALLEY, ILLINOIS, AND | ) | |
| DOUGLAS BERNABEI, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is a Motion for Summary Judgment by the Board of Education of Hall High School, Patricia Lunn, Daniel Oest, and Gary Vicini (the "Hall Defendants").  For the reasons set forth below, the Defendants' Motion for Summary Judgment [#201] is GRANTED IN PART and DENIED IN PART.

## JURISDICTION

This Court has jurisdiction over Plaintiff's § 1983 claims pursuant to 28 U.S.C. § 1331.

## BACKGROUND

As the Court has previously stated on more than one occasion, this litigation arises out of an unfortunate series of events.  The Plaintiff, Gina Purvis ("Purvis"), was a tenured Biology teacher at Hall High School ("Hall") in Spring Valley, Illinois.  The tale begins back in the Spring of 2004 when Purvis and Mickey Ribas ("Ribas"), who was then her 15-year-old student,

became the subject of rumors that there was a sexual relationship between them.  When questioned by Hall Principal Patricia Lunn ("Lunn"), both Purvis and Ribas denied the rumors.

As the rumors continued into the Fall, Lunn and Daniel Oest ("Oest"), Hall's Superintendent, determined that Oest and Gary Vicini ("Vicini"), Hall's Dean of Students and head football and track coach, should investigate.  This would sound like a good plan, except for the fact that Oest was not informed that Purvis had previously reported Vicini to Lunn for his alleged sexual harassment of a female student the year before.  From this, it would not be difficult to infer that Vicini may not have been the most objective investigator for this particular assignment.

On November 10, 2004, Oest and Vicini met with Ribas.  Ribas twice denied having any sexual relationship with Purvis.  During the criminal trial, Ribas testified that in response to his denials on November 10, 2004, Vicini told him that he would be in trouble if he didn't say the story was true and threatened him with expulsion or jail if he persisted in denying the existence of a sexual relationship with Purvis.  Ribas changed his story and told them that he had sex with Purvis on several occasions.  Oest then called Chief Douglas Bernabei ("Bernabei") of the Spring Valley Police Department to report the allegations of sexual abuse against Purvis.  Bernabei met with Ribas that afternoon and notified DCFS of the allegations of sexual abuse.

Beginning on November 10, 2004, Purvis was investigated for sexual assault against Ribas.  She was indicted by a grand jury and arrested on December 15, 2004.  Purvis was initially suspended by the School Board with pay pending the outcome of the criminal proceedings.  On April 6, 2005, the School Board issued a letter advising Purvis that they would hold a hearing on April 18, 2005, to determine whether to take action to terminate her employment.  Purvis'

attorney notified the School Board that they would not attend the hearing, and on April 21, 2005, Purvis was provided with a bill of particulars covering the reasons and causes for her dismissal. A formal hearing was scheduled on the termination charges, but on December 20, 2005, Purvis and the school district reached a settlement whereby she agreed to voluntarily resign her employment in exchange for the sum of $43,000.

Bernabei continued his investigation right up until the trial, serving as the de facto investigator for the police department, prosecutor, and grand jury. On October 31, 2005, at the conclusion of a six-day bench trial, Purvis was acquitted of all charges.

Purvis brings this suit against the Spring Valley Defendants and the Hall Defendants, alleging: (1) the Hall Defendants deprived her of her rights to due process and equal protection; (2) the Hall Board of Education negligently retained, trained, and supervised Oest, Lunn, and Vicini; and (3) the Spring Valley Defendants deprived her of her rights to due process and equal protection. The Hall Defendants have now moved for summary judgment on Counts I and II of the Complaint. The matter is now fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to

3

support the non-moving party's case." Id. at 325.  Any doubt as to the existence of a genuine

issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of

presenting specific facts to show that there is a genuine issue of material fact.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure

56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a

genuine issue for trial.  Celotex, 477 U.S. at 324.  Nevertheless, this Court must "view the record

and all inferences drawn from it in the light most favorable to the [non-moving party]."  Holland

v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be

denied where a reasonable jury could return a verdict for the non-moving party.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928,

931 (7th Cir. 1995).

Section 1983 imposes liability where a defendant acts under color of a state law and the

defendant's conduct violated the plaintiff's rights under the Constitution or laws of the United

States. 42 U.S.C. § 1983. To establish a cause of action under § 1983, the plaintiff must allege

(1) that the defendant has deprived her of a federal right, and (2) that the defendant acted under

color of state law. Gomez v. Toledo, 446 U.S. 635, 640 (1980).  There is no dispute that the Hall

Defendants were acting in their capacity as state actors in conducting the interview/initial

investigation in this case and therefore the only remaining issue is whether Purvis has adequately

presented proof of a deprivation of a constitutional right.

4

The Hall Defendants move for summary judgment on multiple grounds: (1) there is no evidence of willful violations of her due process rights in her criminal case by school officials; (2) Purvis was afforded due process in her administrative hearings; (3) there was no violation of her equal protection rights;  (4) Oest, Lunn, and Vicini are protected by qualified immunity; (5) Purvis has no claim against the Board under Monell v. Dept. of Social Services, 436 U.S. 658 (1978); and (6) there is no evidence to support a claim that teachers and administrators at Hall were negligently trained.  Each argument will be addressed in turn.

I.     Due Process Rights in Criminal Defense

The Hall Defendants contend that there is no evidence that they willfully violated Purvis' due process rights in connection with her criminal case.  Purvis admits that she believes that she had a fair criminal trial.  She has identified her most loyal supporters as her family and former students Rachel Zeibell ("Zeibell"), Kristen Naumann ("Naumann"), and Ashley Denis ("Denis"), as well as fellow Hall employee Kelly Bartolucci ("Bartolucci").  She concedes that Zeibell, Naumann, Denis, and Bartolucci all testified during her criminal trial and will testify for her again in this case if necessary.  That being said, Purvis stated in her deposition that she was told that her supporters were being harassed at school, that the administration was doing nothing about it, and that supporters were told that they could get suspended if they talked about the case.  However, her awareness appears to be based on testimony that she heard during the criminal trial, and she admits that she has no personal awareness of any of these things.

In her deposition, Purvis admits: (1) she has never been told that anyone was instructed not to support her defense; (2) she is not aware of any teachers or students who had information in support of her case but refused to help; (3) she is not aware of anyone who was told to

5

withhold information about her case or assist with her defense; (4) she has no personal knowledge of Oest, Lunn, or Vicini obstructing her lawyer's investigation; (5) she has no personal knowledge of whether student witnesses were told not to talk to the police or that they would be punished if they supported her; (6) she has no knowledge that any of her witnesses were harassed, intimidated, or threatened by Oest, Lunn, or Vicini; (7) she is not aware of anyone being told they would be punished or expelled if they supported her; (8) she does not have any knowledge that Oest, Vicini, or Lunn contacted her witnesses to negatively influence her case; and (9) her answers would be the same with respect to the conduct of the School Board.  (Purvis Dep. at 610-19, 625-27, 655-56)  Rather, her testimony indicates that her knowledge is based on hearing testimony during the criminal trial that students were told that they should not continue to talk about the case one way or the other, negative or positive, at school or they could be suspended, and that kids were getting harassed at school but nothing was being done about it. Id., at 619-21, 626.  When the actual testimony of these students is reviewed, it would appear that Purvis' broad allegations have taken this information somewhat out of context.

Zeibell testified in her deposition that she spoke with Purvis' counsel more than five times through the time of trial and that the school officials never prevented her from talking to him or punished her for doing so.  (Zeibell Dep., at 142) She made notes of her recollections and sent them to Purvis' attorneys to help with her defense and was not punished for doing so.  Id., at 144-45.  Zeibell interpreted a conversation in Lunn's office where she was told that she could talk to Bernabei and the State's Attorney but no one else as a threat, but she did not listen to them.  Id., at 147-48.  Zeibell later clarified that she was told by Lunn that she could be kicked

out of school for harassing another student (i.e., Ribas); she was not told that she could be kicked out of school for cooperating with Purvis' attorneys.  Id., at 402-03.

Bartolucci works as a kitchen supervisor at Hall.  She was not prevented by the Hall Defendants from speaking with Purvis' counsel or her investigator or punished for doing so. (Bartolucci Dep., at 13) At one point, she was supposed to attend a meeting with Purvis' investigator, and Lunn told her that she didn't have to go, but she went anyway after talking to Purvis' attorney.  Id., at 13-14.  She was not prevented from or punished in any way for attending this meeting and did not fear that she would have any issues from the school because she listened to Purvis' attorney.  Id., at 14-15.  Batrolucci complained to Vicini that she did not want her daughter to be harassed by Ribas, and Vicini told her that he would handle it.  Id., at 34-35.  A few weeks later, Ribas made a comment to her daughter's boyfriend to the effect of "tell your girlfriend to shut up, or that bitch to shut up," and they went back to Vicini, who again said that he would handle it in front of Lunn.  Id., at 35-37.  After she approached Vicini a third time to complain that Ribas' conduct had not stopped, Vicini came back to her and said that it the conduct continued then steps would be taken.  Id., at 39-40.  There is no indication in the record that Ribas' conduct did not stop after this.

Bartolucci's daughter, Karli, was a student at Hall.  She spoke with Purvis' attorneys prior to the trial and was never told by the school that she could not meet with the defense team or that she would be punished or expelled for doing so.  (Karli Batrolucci Dep., at 73, 76-77) The Hall Defendants never threatened her or stopped her from supporting Purvis or telling the truth to the police.  Id., at 76-77.  They did not punish her, threaten to punish her, or intimidate her about her feelings and support for Purvis.  Id.  She was not obstructed from bringing forward any

evidence that she had to help Purvis' defense, and Lunn never threatened her with any kind of civil or criminal action if she supported Purvis.  Id.  Karli had a confrontation with Ribas in the classroom where she told him to stop talking about Purvis, and Ribas responded with a "threatening gesture like she better shut her mouth."  Id., at 118-20.  Both she and Ribas were sent to Vicini's office.  Id., at 97.  She does not know what Vicini said to Ribas, but Vicini told her that Ribas had complained that she was antagonizing/harassing him and said that the two of them "just needed to stay away from each other and not say anything" or talk about the trial.  Id.

Denis testified in her deposition that no teachers or administrative staff at Hall ever spoke to her about Purvis' case and that no one ever threatened her or told her that she couldn't testify in support of Purvis.  (Denis Dep., at 139) By then, she had graduated and was no longer at Hall.  Id.  The school district never told her that she couldn't talk to the police; she did talk to the police and told them the truth.  Id., at 142-43.

In her deposition, Naumann stated that she complained to Vicini that other students were harassing her in Spring 2005 by saying things to her in the hallways, and Vicini told her that he would speak with them or take care of the issue.  (Nauman Dep., at 104)  When she didn't feel like anything was being done about the situation, she and Zeibell went to Oest to complain.  Id., at 114-15.  Oest listened to their complaints, but she doesn't know if he said that he was going to take any action.  Id., at 146.  Naumann then related that after she was discussing the case in school and standing up for what she believed in by defending what was said to her by others, she was told that her actions had been construed as harassment and that she could be suspended for harassing Ribas.  Id., at 108-11.  She doesn't recall speaking to Lunn or Vicini at any other time about this subject matter and was never specifically threatened with any punishment in that

8

meeting.  Id., at 111.  She was told that the administration did not want kids talking about the case in school.  Id.  She was never told that she could not support Purvis or testify on her behalf and was not stopped from talking to either the police or Purvis' attorneys.  Id., at 112.  There was nothing she wanted to say in support of Purvis' defense that she was stopped from doing by school officials, including Oest, Vicini, and Lunn.  Id.

Purvis points to the fact that after she was charged, Oest had a meeting with Hall staff in the library and told them that she had been charged and that if they were approached or contacted, they may refer them to him.  He later advised the staff that if they chose to speak, they should understand that they were speaking as individuals and not as representatives of the school district.  (Oest Dep., at 92-94) Oest told Lunn and Vicini that they were not obligated to speak with defense counsel or investigators outside of police authorities and could refer them to the school district's attorneys.  Id., at 111.  Vicini testified that he was instructed by Oest to refer Purvis' investigators to the school's lawyers.  (Vicini Dep., at 195)  Oest further recalls advising the staff that they were not obligated to speak with anyone and if they were not comfortable speaking with someone, they did not have to but could refer them to him.  (Oest Dep., at 112)

Purvis cites a report to Bernabei by Assistant Chief Sangston indicating that he had been flagged down by Denis' father and told about an incident at school in which Ribas had allegedly strangled his son.  (Bernabei Dep., at 282-83) Rick Denis stated that the matter was being handled by the school and that he did not want the police to do anything about it.  Id.  However, Purvis leaves this assertion hanging in mid-air and does not make any attempt to follow it up with a citation to evidence that the school did nothing to reprimand Ribas or stop the perceived harassment.  Without this additional information, this evidence is simply not probative of her

9

position and in fact, supports the inference that the school was addressing claims of witness harassment.

While Purvis has elicited testimony suggesting that school officials may not have responded as aggressively as one would hope in controlling a potentially hostile environment in the school, even when all reasonable inferences are drawn in her favor, she has not set forth evidence sufficient to create an issue of fact as to whether the Hall Defendants improperly interfered with her witnesses. She has at most shown that the Hall Defendants directed everyone (whether a Purvis supporter or a Ribas supporter) to refrain from discussing the situation at school and informed employees that it was their decision if they wanted to talk to investigators/defense team or refer questions to Hall's attorney. This is a far cry from precluding or intimidating witnesses from being interviewed, providing information to the defense, or testifying without fear of repercussions. Purvis' bald allegations to the contrary are therefore without merit.

In fact, contrary to Purvis' allegations, each of her supporters testified that they were not told not to assist her or threatened with punishment if they assisted her in any way. They further testified that they did fully cooperate with her attorneys and participate in her defense and that there was no additional information or assistance that they were prevented from presenting. Due process protects a defendant's right to call her own witnesses to help present the defendant's version of the facts and assist in her defense. Webb v. Texas, 409 U.S. 95, 98 (1972), *citing* Washington v. Texas, 388 U.S. 14, 19 (1967). As the undisputed evidence of record indicates that this is precisely what Purvis did in this case where all of her identified supporters testified

that they cooperated and testified fully in her defense, Purvis has clearly failed to satisfy her burden, and the Hall Defendants are entitled to summary judgment on this claim.

Purvis next asserts that the Hall Defendants violated her due process rights by withholding or suppressing exculpatory evidence.  It is far from clear that a plaintiff can maintain what is essentially a Brady claim against her employer.  Even assuming for purposes of resolving this motion that Purvis may proceed with such a claim, it is undisputed that such a  claim requires that a plaintiff demonstrate: (1) the evidence at issue was favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by an agent of the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice to the accused.  Harris v. Kuba, 486 F.3d 1010, 1014 (7th Cir. 2007).  "Prejudice exists if there is 'a reasonable probability that the suppressed evidence would have produced a different verdict.'" Id.

In Carvajal v. Dominguez, the Seventh Circuit cast the third element of this analysis as equivalent to materiality and noted that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 542 F.3d 561, 566-67 (7th Cir. 2008), citing Strickler v. Greene, 527 U.S. 263, 280 (1999).  Given this restrictive interpretation, the Court of Appeals expressed doubt that an acquitted defendant could ever satisfy the prejudice requirement necessary to establish a Brady violation.

In its more recent decision in Bielanski v. County of Kane, et al., ___ F.3d ___, 2008 WL 5245997, at *10 (7th Cir. Dec. 18, 2008), the Court of Appeals noted that the Supreme Court has

not ruled on this precise question and noted language from <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995):

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

The Seventh Circuit discussed its ruling in <u>Carvajal</u> that the violation has to be "measured with the outcome in mind" and proceeded to analyze Bielanski's claim to determine whether the evidence was such that the decision to go to trial would have been altered had the evidence been disclosed.  2008 WL 5245997, at *11.

Here, Purvis continues to rely on what she has alleged, but at summary judgment, the Court must focus on what she has been able to support with actual evidence or inferences that could reasonably be drawn from such evidence.  She points to the failure of Lunn and Vicini to tell Oest that Purvis had previously relayed a student's complaint of sexual abuse by Vicini.  She criticizes the school's failure to investigate or explain the deletion of folders from her computer after it was taken into Oest's possession, but she has not identified computer files that would have been relevant to her defense had they not been deleted, and the Court could find no information as to the contents of the deleted folders in the record.  Purvis refers to "a secret meeting between Bernabei and Vicini in which they discussed the truth and credibility of Mickey's story" but has not provided any direct evidence sufficient to support the reasonable inference that there was a meeting with such a nefarious purpose.  She also complains of the failure to provide Oest's handwritten notes from the November 17, 2004, student interviews, some parts of which could be construed as indicating that at some time, Ribas had denied having

a sexual relationship with Purvis; other portions of the notes indicate that Ribas had admitted to having a sexual relationship with Purvis.  The names of all students interviewed were contained in Bernabei's police report and known to her at the time of her trial.

This evidence, albeit disturbing to the Court, is largely impeaching rather than exculpatory, and in the case of Oest's notes, the evidence also contains information corroborating the allegations against Purvis.  Some of this evidence would have contributed to a vigorous cross-examination and could likely have caused the trier of fact to question the credibility of several witnesses.  That being said, while this evidence may have been sufficient to weaken the prosecutor's case and contribute to a finding of reasonable doubt, it is not the type of evidence that would have caused Herrmann to drop the charges against Purvis entirely given the other evidence uncovered during the investigation (i.e., the testimony of Rick Andes that he observed Purvis and Ribas kissing and discussing sexual activity; phone records indicating hundreds of calls between Purvis and Ribas; Ribas' production of gifts that he claimed were given to him by Purvis and detailed description of her house; the testimony of students indicating that Ribas had bragged to them about his sexual relationship with Purvis; Purvis' admission that they had kissed and that he had been to her home while her husband was out of town).

Purvis admits that she received a fair trial and makes no attempt to demonstrate how she was prejudiced by the failures that the Court has found to be supported by the record. Accordingly, the Court must conclude that despite the arguable suppression of this evidence, Purvis's trial resulted in a verdict that was worthy of confidence, and her attempt to bring a suppression claim in light of the precedent established by Carvajal and Bielinski must therefore be rejected.

13

Finally, she argues that her due process rights were violated as a result of Vicini's bias. In support of this assertion, she again relies on the now quite familiar assertion that because Purvis had previously relayed Denis' allegation of sexual abuse by Vicini, "therefore he had a motive of retribution and retaliation."  From this, she concludes that Vicini intimidated Ribas into making false allegations against her, influenced Oest's decision to find him credible, and prompted Oest to report the allegations to Bernabei without further investigation, thereby causing her injury.  As Bernabei acted upon these allegations in conducting his investigation, and DCFS relied at least in part on the results of Bernabei's investigation, Purvis maintains that Vicini's bias essentially "poisoned the well" of the entire proceedings against her.  She cites Levenstein v. Salafsky, 2003 WL 22096486, at *3-6 (N.D.Ill. Sept. 9, 2003) in support of her position.

The constitutional standard for proving impermissible bias is high, as there is a presumption that adjudicators act with honesty and integrity.  Piggie v. Cotton, 342 F.3d 660, 666 (7th Cir. 2003), citing Withrow v. Larkin, 421 U.S. 35, 47 (1975).  That being said, the Seventh Circuit has recognized that there is a deprivation of due process where the procedures used to investigate the charges are rendered a sham as a result of bias.  Levenstein v. Salafsky, 164 F.3d 345, 351-52 (7th Cir. 1998).

Similar allegations of a biased investigation were discussed in Trejo v. Shoben, 319 F.3d 878, 888 (7th Cir. 2003).  In Trejo, the plaintiff alleged that his due process rights were violated because the defendant conducted a one-sided investigation because he harbored personal grudges against the plaintiff.  In that case, the Seventh Circuit noted that even if the defendant was "brimming over with animosity," the plaintiff suffered no due process violation because the

14

defendant's recommendation was reviewed by two separate, independent entities conducting their own investigation of the charges and reaching the same conclusion.  Id.

When viewed in the light most favorable to Purvis, the facts underlying this claim are as follows.  Vicini testified in his deposition that early one morning in 2002, Lunn came to his office and told him that he had been accused of misconduct with a female student.  (Vicini Dep., at 41)  Lunn also advised him that she was going to bring Ashley to his office to discuss the matter.  Id., at 43.  Vicini was sitting behind the desk in the office when Lunn brought Denis into the room.  Id., at 66.  Denis testified that Lunn then took her into Vicini's office, shut the door, and allowed Vicini to slam his fist on the desk and yell that he never did anything to her.  Vicini admits that he was the first person to speak and said, "I didn't do that Ashley," but does not admit slamming his fist on the desk.  Id., at 69-71.  The meeting lasted only about three minutes.  Id., at 72.  After reviewing Denis' testimony, Lunn indicated items that she disagreed with in her testimony but did not voice any disagreement with Denis' assertion that Lunn closed the door or her description of Vicini slamming his fist on the desk and yelling.  (Lunn Dep., at 182-84)

The manner in which the Vicini investigation was handled reveals severe lapses in judgment by both Lunn and Vicini.  A reasonable jury could infer that Vicini's conduct reveals that he was very angry at the reporting of the allegations against him and that this conduct was also an attempt to intimidate Denis from persisting in her allegations.  Lunn displayed extremely poor judgment by revealing to Vicini that it was Purvis who had relayed Denis' complaints to her.  The Court cannot comprehend any reasonable justification for this disclosure by Lunn; had she not done so, many of the claims asserted in this litigation would have had no conceivable basis.  Given his conduct during the brief conversation with Denis, it would not be unreasonable

15

to infer that Vicini was angry with or harbored an animosity against Purvis for having relayed Denis' complaint.  Lunn then sat back and said nothing while Vicini joined Oest in conducting the initial interview of Purvis.

Although Ribas had been spreading rumors about having sex with a teacher to other students prior to meeting with Oest and Vicini, he initially denied that the rumors were true twice.  Ribas testified that it was only after Vicini threatened him with expulsion, arrest, and going to jail that he changed his story and said that the rumors were true.  Oest was also present for the initial interview and testified that he also felt that Ribas was credible.  While Vicini was not an actual decisionmaker in this case, there is evidence indicating that Vicini expressed his opinion that Ribas was credible to Oest, and the Court cannot rule out the possibility that Oest's opinion was improperly influenced by Vicini.

Bernabei and O'Brien conducted their own investigations, but there is no evidence in the record indicating that Bernabei, Herrmann, or O'Brien were made aware of Vicini's potential bias or what could be construed as his intimidation of Ribas during the initial interview. Furthermore, both State's Attorney Herrmann and O'Brien have indicated that they would like to have been made aware of this kind of information.  Herrmann testified in his deposition that he was not made aware of Ribas' claim that Vicini had threatened him with being prosecuted and going to jail if he continued to say that the rumors were untrue until Ribas' testimony during the criminal trial.  (Herrmann Dep., at 74-75) O'Brien testified that she was not made aware that Purvis had previously relayed a female student's allegations of sexual abuse by Vicini or anything about that investigation.  (O'Brien Dep., at 78-80)  The record does not permit a finding

16

one way or the other as to whether their opinions of credibility would have been different had they known this information.

Levenstein acknowledges that a due process violation may occur where there is no adequate opportunity to respond as a result of sham procedures being used to investigate the charges. 164 F.3d at 351. Given the factors discussed above, the Court cannot rule out the possibility that a reasonable jury could find that Vicini harbored a bias against Purvis and that his involvement in the initial interview, including the arguable intimidation of Ribas, resulted in Ribas' statement itself and every process that followed being tainted or unreliable. Nor does this record permit the Court to find as a matter of law that the investigations of Bernabei and DCFS were untainted and truly independent as was the case in Trejo.

In a perfect world, Vicini would not have been told that it was Purvis who relayed Denis' allegations against him to Lunn and would have had no involvement in the investigation of the allegations against Purvis at all. As there is evidence from which a jury could draw the reasonable inference of an actual or pervasive bias by Vicini bordering on fraud or a pecuniary interest that could possibly render all of the ensuing investigation and indictment a sham and deprive Purvis of due process, the Hall Defendants' Motion for Summary Judgment must be denied on this claim. *See* Howlett v. Walker, 417 F.Supp. 84, 86 (C.D.Ill. 1976), *citing* Gibson v. Berryhill, 411 U.S. 564 (1973). While there is also evidence suggesting that she received a constitutionally sufficient opportunity to respond, and her ability to succeed at trial is far from clear, it will ultimately be for the jury to resolve issues of credibility to determine whether Vicini in fact harbored a bias against Purvis and if so, whether this bias was sufficiently pervasive to have rendered the remainder of the proceedings unreliable.

II.     Due Process Rights in Administrative Hearings

"Procedural due process claims require a two-step analysis.  The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due."  Luellen v. City of East Chicago, 350 F.3d 604, 613 (7th Cir. 2004), *citing* Strasburger v. Board of Education, Hardin County Comm. Unit School Dist. No. 1, 143 F.3d 351, 358 (7th Cir. 1998).  In order to establish that she was deprived of a right, privilege, or immunity guaranteed by the Constitution, Purvis must show that: (1) the claimed interest is a protected property or liberty interest; (2) the alleged loss amounted to a deprivation; and (3) that the deprivation was without due process of law.  Defendants first argue that Purvis was not deprived of any property interest, as she was suspended with pay and subsequently agreed to voluntarily resign her employment.

Purvis correctly notes that the Seventh Circuit has acknowledged that a suspension with pay from a statutorily protected employment position "might produce indirect economic effects that trigger the protection of the Due Process Clause."  Id., *citing* Townsend v. Vallas, 256 F.3d 661, 676 (7th Cir. 2001).  However, she does not actually claim losses from her suspension with pay, but rather cites "the loss of her tenured teaching position, its pay and benefits, and expenses, costs, and fees associated with defending herself in the criminal trial and DCFS administrative proceedings."  And this is where Purvis seeks to have the benefits of her settlement without accepting any consequential burdens.

In her settlement, the school district agreed to reinstate Purvis to her position, provide a neutral letter of reference, and pay her $43,000 "in settlement of her claim for reinstatement and back pay, and any other form of damages relating to reinstatement as a biology teacher and coach

18

and back pay, and for attorneys fees and costs incurred in connection therewith" in exchange for her immediate, voluntary resignation.  The Settlement Agreement included language excluding claims raised in this lawsuit.  While this may prevent the Defendants from arguing that the settlement completely bars Purvis from pursuing her claims in this case, it does not and cannot foreclose a finding by the Court that an element of the settlement precludes her from establishing an element necessary to prevail upon one or more of her claims.

Here, the record reveals that Purvis' placement on paid suspension did not deprive her of the benefits that she sets forth in her response.  Rather, the permanent loss of her tenured teaching position, including its pay and benefits, occurred as a result of her voluntary resignation pursuant to the settlement.[1]  Purvis must also be reminded that the protected property right at stake is with respect to her employment status.  The Settlement Agreement expressly provides that she is accepting the $43,000 in settlement of her claim for reinstatement . . .  and for attorneys fees and costs incurred in connection therewith," and she provides no legal basis for seeking reimbursement of her criminal attorneys' fees from these Defendants pursuant to this theory of recovery.  Accordingly, Purvis has failed to demonstrate that the Hall Defendants deprived her of a constitutionally protected property interest.

The Court has also found that Purvis claims more than the mere liberty interest in her reputation, arguing that the damage to her reputation as a result of Defendants' conduct made it

---

[1] Even in the event that the time between the termination decision and her reinstatement pursuant to settlement is considered, the record indicates that her base salary for the entire school year was $32,908.  She was paid $27, 971.80 for her pay and received the school district's insurance benefits through April 18, 2005, as well as the additional $43,000 that she received in settlement.  Accordingly, Purvis has failed to establish that she suffered any pecuniary loss in fact prior to her voluntary resignation.

virtually impossible for her to obtain other employment as an educator.  Under Depuy v. Samuels, 397 F.3d 493, 503 (7th Cir. 2005) and Boyd v. Owen, 481 F.3d 520, 524 (7th Cir. 2007), this is sufficient to implicate a protected liberty interest.

Purvis cites Depuy for the proposition that "when a state actor casts doubt on an individual's good name, reputation, honor or integrity in such a manner that it becomes virtually impossible for the individual to find new employment in his chosen field, the government has infringed upon that individual's liberty interest to pursue the occupation of his choice." 397 F.3d at 503.  That being said, where there has been an allegation of abuse of a minor, school officials are mandatory reporters and must report the allegations to the proper authorities.  Furthermore, where such allegations also constitute criminal activity, one would reasonably expect that there would be an official police investigation and that the results of that investigation would be reported back to the school district and DCFS.  It is also undisputed that a school board can suspend or revoke a teacher's employment based upon evidence that the teacher has been deemed an indicated perpetrator by DCFS.

In her response on this claim, Purvis largely rests upon the holding in Dupuy.  The evidence that she cites in support of this claim is:

> As expressed by DCFS' Judy O'Brien, the perpetrator indication still ruins plaintiff's life.  Plaintiff cannot teach again, her chosen profession in which she was a very good tenured science teacher. Plaintiff cannot be in a position where she is a caretaker for children.  One need only Google her name to find what her children will one day discover when they surf the internet.

With all due respect, Purvis' response does not indicate injury as a result of her termination.  Perhaps this is because she voluntarily resigned her employment pursuant to

settlement and received a neutral letter of reference from the school district. She complains only of the effects of her indicated finding, which are admittedly substantial. The Court has found a genuine issue of material fact requiring resolution by a jury with respect to the question of whether Vicini harbored such a pervasive bias against Purvis that he improperly influenced the initial interview with Ribas to the extent that everything that flowed from that interview was sufficiently unreliable to have deprived her of her right to due process. Given this finding, Purvis' claim with respect to a deprivation of her liberty interest must also await resolution at trial.

III.    Equal Protection

Defendants move for summary judgment on Purvis' Equal Protection claim. Specifically, Purvis alleges that the Hall Defendants intentionally treated her differently than male suspects with no rational basis for the difference in treatment other than an illegitimate animus against her. Again, there is no dispute regarding whether they were acting under color of law, so once again the only relevant question is whether Purvis' right to equal protection of the laws was violated.

The Equal Protection Clause of the Fourteenth Amendment protects individuals from discriminatory administration and enforcement of the law. Jackson v. City of Moline, 2006 WL 1554075 (C.D. Ill. 2006). In a traditional Equal Protection claim, a plaintiff must demonstrate that (1) she is otherwise similarly situated to members of the unprotected class; (2) she was treated differently from members of the unprotected class; and (3) the defendant acted with discriminatory intent. Greer v. Amesqua, 212 F.3d 358, 370 (7th Cir. 2000). The Seventh Circuit also recognizes Equal Protection claims brought by a "class of one" when (1) the plaintiff alleges

that she has been intentionally treated differently from others similarly situated and; (2) there is no rational basis for the difference in treatment or the defendant was motivated by discriminatory animus. McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004).

In this case, Purvis asserts a "class of one" claim and maintains that she was treated differently from Vicini, who had previously been accused of sexual misconduct toward a student. Specifically, she argues that Vicini was accused of inappropriately touching a student and denied any misconduct but was never referred to, investigated, and arrested by Bernabei or deemed an indicated abuser by DCFS.

Defendants spend several pages arguing that Vicini and Purvis were not similarly situated. In the Seventh Circuit, there is no set formula for assessing whether two individuals are similarly situated, and the inquiry is generally a factual question for the jury. McDonald v. Village of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004). However, "similarly situated individuals must be very similar indeed," and in the employment context, "[m]ore evidence than the mere fact that other employees were not discharged for at best arguably similar misconduct must be demonstrated." Id., *citing* Hiatt v. Rockwell International Corp., 26 F.3d 761, 771 (7th Cir. 1994). A court may grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met. Id.

Vicini and Purvis were both teachers at Hall. Denis, a minor student, accused Vicini of having touched her inappropriately on more than one occasion. Denis alleged that she and another female student were called out of class into Vicini's office and told to try on the bottom portion of a track uniform that fits snugly like underwear and is commonly described as "bun shorts." When they came out of the bathroom, Vicini asked Denis to turn around and then ran

22

his finger on the inside of the elastic on the bottom between the uniform and her skin, touching her buttocks.  Denis further asserted that Vicini had touched her buttocks inappropriately approximately ten times while spotting her in practicing a pole vault exercise and patted girls on the buttocks after they ran good races.

After Purvis informed Lunn of Denis' allegations against Vicini, Lunn pulled Denis out of class, took her to Vicini's office, and closed the door.  (Denis Dep., at 61-63)  It defies common sense that Lunn would consider it appropriate to conduct her first interview with Denis in the presence of her accuser, yet this is apparently what occurred.  Denis testified in her deposition that once she was in the office and the door was closed, Vicini slammed his fist on the desk and said, "I never did anything to you."  Id.  When Denis did not respond, Lunn said, "These are very serious statements, his career is on the line."  Id.  Denis was dismissed back to her classroom crying.  Id., at 163.  Lunn then apparently interviewed other "witnesses" and asked teachers to comment on Denis' reliability, but did not contact the police or DCFS to report the allegations.  Vicini remained in his teaching position during the investigation.

Robert Verdun, Hall's Superintendent at that time, testified in his deposition that he met with Denis and her parents twice.  He testified that during their second meeting, Denis' parents told him that they did not feel that Vicini had acted inappropriately, that Denis was prone to exaggeration, and they did not want to see Vicini disciplined.  (Verdun Dep., at 30-32)  His testimony further indicates that interviews of the student witnesses would not support Denis' claims, and that after the investigation, he concluded that none of the touching had been done for Vicini's own sexual gratification and that there had been no action that would have warranted reporting to DCFS.  Id., at 34, 49-51.  Contrary to one of Verdun's assertions, Mrs. Denis wrote a

23

letter that was extremely critical of the way the investigation had been handled and concluded with their belief that Vicini had engaged in inappropriate conduct with their daughter.  The letter does not state that Mrs. Denis believed that her daughter had exaggerated or contain any request that Vicini be disciplined other than the request that Vicini not be in a situation where he was alone with Denis again.  Defendants further claim that a disciplinary memo was placed in Vicini's file, but Vicini has stated that he did not receive a copy of the memo and does not recall being made aware of any of the recommendations with the exception of being told to discontinue teaching the pole vault exercise in a way that caused him to put his hands on any part of the girls' anatomy.  (Vicini Dep., at 60-64)

By contrast, after Lunn heard rumors that there was a sexual relationship between Purvis and Ribas, she talked to Oest and decided that Oest and Vicini should interview Ribas.  Unlike Vicini, who was allowed to personally confront his accuser prior to any personal interview with Denis to determine the precise nature of her allegations or assess her credibility, Purvis was not made aware of the allegations before the interview or allowed to be present to confront her accuser.  Following the interview, there was no attempt by school officials to interview other witnesses or question teachers regarding his reliability before officially reporting the allegations.  After consulting with the school's attorney, Oest immediately called Bernabei to report the allegations, and Purvis was immediately suspended from her teaching position.

Defendants cite to evidence that allegations that another teacher, Phil Powers, had sex with a student were treated the same way as the allegations against Purvis.  While subsequent investigation revealed additional and more serious instances of misconduct, the initial statement of the victim and reporting guidance counselor do not reveal actual allegations of sexual

intercourse but rather allegations of sexually themed conversation, requests for the student to go

on a date with him, and an incident where Powers placed his hand under the victim's skirt and

touched her "crotch area."  Verdun testified in his deposition that upon hearing the counselor's

report, he immediately advised him to fulfill his mandatory reporter responsibilities, and the

counselor contacted the police.  Bernabei investigated, reported the matter to DCFS, and

informed the State's Attorney.  Powers was prosecuted and pled guilty.  Accordingly, it would

appear that the allegations against Powers lie somewhere between the allegations against both

Purvis and Vicini in terms of the severity of the alleged misconduct known to school officials at

the time that they made the decision to report the allegations to the authorities.

The Court first notes that it is questionable that the right to bring a "class of one" equal

protection claim is even available in Purvis' situation.  "The paradigmatic 'class of one' case . . .

is one in which a public official, with no conceivable basis for his action other than spite or some

other improper motive, comes down hard on a hapless private citizen."  Lauth v. McCollum, 424

F.3d 631, 633 (7th Cir. 2005).  The Seventh Circuit has held:

> As one moves away from the paradigmatic case, the sense of a
> wrong of constitutional dignity, and of a need for a federal remedy,
> attenuates.  And when . . . the unequal treatment arises out of the
> employment relation, the case for federal judicial intervention in
> the name of equal protection is especially thin.  Given the legal
> protections that tenured public employees . . . enjoy . . ., which
> include the right to sue in federal or state court under section 1983
> for a deprivation of property . . . without due process of law, there
> is no gap in legal protections to justify dragging in equal-protection
> concepts designed for entirely different situations. . . . The
> principal effect of "class of one" suits by public employees is . . . to
> undermine discipline in public agencies. . . . We are therefore not
> surprised to have found no "class of one" cases in which a public
> employee has prevailed, since the extreme case that kicked off the
> "class of one" movement more than two decades ago.

25

Id., at 633-34.  The purpose of entertaining such a claim "is not to constitutionalize all tort law nor to transform every claim . . . for improper conduct of an investigation in connection with them into a federal case."  McDonald, 371 F.3d at 1009.

For purposes of resolving this motion, the Court will presume that a "class of one" theory remains available to Purvis in this circuit.  That being said, a plaintiff attempting to prove a class of one violation faces a very high hurdle.  Where the plaintiff is essentially arguing that she was selectively prosecuted, which is analogous to the claim made by Purvis here, the Seventh Circuit has held, "that in order for an individual to be similarly situated for such purposes, the evidence against the comparator must be 'as strong [as] or stronger' than that against the person arguing there has been an equal protection violation."  McDonald, 371 F.3d at 1006.  Individuals are similarly situated "when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  Id., citing United States v. Hastings, 126 F.3d 310, 315 (4th Cir. 1997).  In other words, to prevail in a "class of one" claim, a plaintiff must "negative any reasonably conceivable state of facts that could provide a rational basis for the classification."  Lauth, 424 F.3d at 634, citing Board of Trustees v. Garrett, 531 U.S. 356, 367 (2001).

Here, a student gave a statement that Purvis had repeatedly had sexual intercourse with him.  The allegations against Vicini accused him of inappropriately touching the buttocks of a student while she was trying on a new track uniform and while practicing a pole vault exercise in the presence of other students.  While both are arguably similar in that they both constitute serious allegations that could amount to criminal misconduct, the severity of the two actions can rationally be distinguished, as having sexual intercourse with a student is clearly more serious

26

than an inappropriate touching of the student's buttocks that did not result in penetration.  This is a reasonably conceivable basis for the difference between immediately reporting the reported allegations to the police and conducting further investigation first.  Verdun also testified that after interviewing witnesses in the allegations against Vicini, no other witness confirmed Denis' version, and that even Denis' parents urged him to take no action against Vicini.  The Court has scoured Purvis' brief in search of some citation to <u>evidence</u> contradicting Verdun's testimony, but was unable to find any such evidence.  Therefore, Purvis has failed to negate the possibility that these factual differences provide another legitimate basis for distinguishing the school administrators' conduct, and the Court cannot find that she has made a sufficient demonstration of substantial similarity between herself and Vicini to proceed.

Even assuming that substantial similarity could be found, Purvis' claim cannot meet the high standard set by the Court of Appeals in <u>Lauth</u> for this type of claim.  "Governmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized."  <u>Id.</u>, at 634, *citing* <u>Lamers Dairy, Inc. v. U.S. Dept. of Agriculture</u>, 379 F.3d 466, 473 (7th Cir. 2004).  Animus is to be considered only where no rational reason or motive for the action can be imagined, and "the action would be inexplicable unless animus had motivated it."  <u>Id.</u>  A showing must be made that the "totally illegitimate animus . . . was the sole cause" for the action taken.  <u>Id.</u>, at 634, *citing* <u>Nevel v. Village of Schaumburg</u>, 297 F.3d 673, 681 (7th Cir. 2002).  Purvis' claim would also fail on this inquiry.

While allegations of having sexual intercourse with a student are clearly more serious than allegations of an inappropriate touching, the allegations against all three teachers were sufficiently serious to have indicated criminal misconduct.  A reasonable person would have

27

expected that all allegations of criminal misconduct by a teacher against a student would be reported for official investigation pursuant to their status as mandatory reporters and for the school to have let the official investigation uncover information corroborating and/or refuting the allegations, as was done with the allegations against Purvis and Powers.  In fact, the Court believes that the handling of the allegations against Vicini demonstrates severe errors in judgment by Lunn at the very least.  That being said, while the Court may have done things differently if it were in the Defendants' position, the Court cannot conclude that there was no rational basis for the difference in treatment between Purvis and Vicini, given the fact that Purvis was accused of repeatedly having sexual intercourse with the student.  Defendants are therefore entitled to summary judgment on her equal protection claim.[2]

## IV.   Qualified Immunity

Oest, Lunn, and Vicini assert claims of qualified immunity.  In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the United States Supreme Court enunciated the "modern standard to be applied in qualified immunity cases."  Auriemma v. Rice, 895 F.2d 338, 341 (7th Cir. 1990).  The Court stated:

> Governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

---

[2] The Court notes that the only conceivable way for Purvis to prevail on her equal protection claim and avoid a finding of a rational basis for the difference in treatment would be based on a finding of substantial similarity in that the allegations against both Vicini and her were serious enough that they should have been immediately reported.  However, this would mean that Vicini should have been reported, not that Purvis should not have been reported.  Accordingly, even assuming that she could otherwise establish the elements of her claim, the Court would be compelled to conclude that she suffered no compensable equal protection injury.

Harlow, 457 U.S. at 818.   The test for qualified immunity is "whether the law was clear in relation to the specific facts confronting the public official when [he or she] acted."   Green v. Carlson, 826 F.2d 647, 649 (7th Cir. 1987).  In deciding whether a defendant will enjoy qualified immunity, courts must determine:  "(1) whether the plaintiff has asserted a violation of a federal right, and (2) whether the constitutional standards implicated were clearly established at the time in question."  Eversole v. Steele, 59 F.3d 710, 717 (7th Cir. 1995), *citing* Kernats v. O'Sullivan, 35 F.3d 1171, 1176 (7th Cir. 1994).  The first issue is a threshold one.  Scott v. Harris, ___ U.S. ___, 127 S.Ct. 1769, 1774 (2007), *citing* Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the plaintiff fails to state a violation of a federal right, then the plaintiff's claim fails altogether and the court need not go on to decide whether the law was clearly established at the time of the offense.  Id.; *see also,* Marshall v. Allen, 984 F.2d 787, 793 (7th Cir. 1993); Zorzi v. County of Putnam, 30 F.3d 885, 892 (7th Cir. 1994); Eversole, 59 F.3d at 717.

In outlining the approach a court must take in addressing qualified immunity, the Seventh Circuit has advised:

> Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law.

Landstrom v. Ill. Dept. of Children & Family Serv., 892 F.2d 670, 675 (7th Cir. 1990), *quoting* Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc), *cert. denied*, 109 S.Ct. 497 (1989).

Here, the Court has found a genuine issue of material fact with respect to Purvis' claim that she was denied due process in her criminal proceedings as a result of Vicini's bias and with

29

respect to her liberty interest in pursuing employment in her chosen profession.  On the question

of whether the law was clearly established at the time in question, the briefs of both parties on

this issue are lacking.  The Court agrees with the Hall Defendants' argument that educators

fulfilling their duties as mandatory reporters should not face liability merely for their actions in

complying with state law as a general proposition.  However, the record in this case when

construed in the light most favorable to Purvis promotes the inference that the actions of the

educators in this case went far beyond merely fulfilling their duties as mandatory reporters.

       In <u>Levenstein v. Slalfsky</u>, 164 F.3d 345, 351 (7th Cir. 1998), the Seventh Circuit noted

that "when the procedures used to investigate the charges are a sham through and through, there

has not been a constitutionally sufficient opportunity to respond."  *See also,* <u>Doe v. Board of</u>

<u>Education of Oak Park & River Forest High School Dist. 200</u>, 115 F.3d 1273, 1283 (7th Cir.

1997).  The Court of Appeals went on to deny a claim of qualified immunity based on the

conclusion that, "The pertinent constitutional standards are long-standing . . . clarifying the

commonsense notion that fundamentally biased process is not due process."  <u>Id.</u>, at 352, *citing*

<u>Palko v. Connecticut</u>, 302 U.S. 319, 327 (1937); <u>Fay v. New York</u>, 332 U.S. 261, 288 (1947).

Construing the record and all inferences reasonably drawn from it in the light most favorable to

Purvis, the Court finds that the contours of the due process right to be free from an investigation

and subsequent proceedings that were not rendered unreliable as a result of pervasive bias were

sufficiently clear that a reasonable official would have understood that what happened here could

violate Purvis' due process rights.

       Prior to 2004, case law in this circuit established that an individual has a protected liberty

interest to pursue employment in her chosen field and that this interest is infringed when a state

actor casts doubt on that individual's good name, reputation, etc., such that it becomes virtually impossible for the individual to find new employment in that field.  Townsend v. Vallas, 256 F.3d 661, 669-70 (7th Cir. 2001); Head v. Chicago School Reform Board of Trustees, 225 F.3d 794, 801 (7th Cir. 2000); Strasburger v. Board of Education, Hardin County Community Unit School Dist. No. 1, 143 F.3d 351, 356 (7th Cir. 1998); Johnson v. Martin, 943 F.2d 15, 16 (7th Cir. 1991); Colaizzi v. Walker, 812 F.2d 304, 307 (7th Cir. 1987); Oliveri v. Rodriguez, 122 F.3d 406, 408 (7th Cir. 1997); Lashbrook v. Oerkfitz, 65 F.3d 1339, 1348-49 (7th Cir. 1995). Accordingly, the Court finds that the law was clearly established in this respect, as well, and Defendants are not entitled to qualified immunity on these claims.

V.      § 1983 Claims Against the Board

Although there is no respondeat superior liability under § 1983, a municipal entity can be held liable under § 1983 if there is a showing of a law, policy, or procedure intended to violate a person's constitutional rights.  Monell v. Dept. of Social Services, 436 U.S. 658 (1978).  Here, Purvis alleges that a discriminatory policy was in effect during the investigation and prosecution of the allegations of abuse against her. Specifically, she contends that Oest, Lunn, and Vicini, are the policy-makers and decision-makers for the Board and set its custom and policy.

The Hall Defendants maintain that Purvis' claims against the Board remain completely unsubstantiated as anything other than respondeat superior.  The Court agrees, and the Board's request for summary judgment will therefore be granted on Purvis' § 1983 claims against it.

31

VI.     Negligent Training or Retention

Purvis alleges that the Board was negligent in retaining Lunn and Vicini, as well as in promoting Vicini to Dean of Students, and that Oest, Lunn, and Vicini were not adequately trained to investigate claims of sexual abuse.  In order to maintain her claim, Purvis must show:

> (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury.

Van Horne v. Muller, 185 Ill.2d 299, 311 (Ill. 1998).  The unfitness of the employee must have "rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position."  Id.

Purvis points to the Board's admitted awareness of the investigations of Powers, Vicini, and herself.  She then criticizes that "the Board does not offer evidence that it 'investigated' or audited these investigations to see if they were in compliance with standards relating to sexual abuse of a minor" without providing any citation to a duty on the part of the board to conduct an independent investigation into these investigations.  Purvis then leaps to the bald conclusion that "the Board knew or should have known that Vicini and Oest had no specialized training for interviewing a sexually abused minor and conducting an investigation into the sexual abuse of a minor" without making any effort to factually establish that Vicini and Oest lacked such training. Notably absent is any citation to factual evidence in the record or caselaw in support of these assertions.

32

In what can at best be construed as a perfunctory and undeveloped response, Purvis has utterly failed to provide any basis upon which a reasonable jury could find that the Board knew or should have known of prior misconduct by either Oest, Lunn, or Vicini prior to their hiring, retention, or promotion that would make them particularly unfit for their respective positions. The same is true of her claim for lack of training, given her complete lack of citation to any evidence indicating what training is reasonably necessary or that these Defendants had not had such training. She has therefore failed to establish any duty owed by the Board that was breached in this case, and summary judgment must be granted on this claim as well.

## CONCLUSION

For the reasons set forth above, the Hall Defendants' Motion for Summary Judgment [#201] is GRANTED IN PART and DENIED IN PART. The Board of Education is now terminated as a party to this litigation. This matter remains set for final pretrial conference/Daubert hearing on January 21, 2009.

ENTERED this 12th day of January, 2009.


s/ Michael M. Mihm
Michael M. Mihm
United States District Judge